**16-1004**

---

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

---

MIDDLE EAST BROADCASTING NETWORKS, INC.,

Plaintiff-Appellee,

v.

MBI GLOBAL, LLC,

Defendant-Appellant.

---

On Appeal from the United States District Court for the
Eastern District of Virginia (Alexandria Division), Case No. 1:14-CV-1207
The Honorable Gerald Bruce Lee, District Judge

---

## <u>BRIEF OF APPELLANT MBI GLOBAL, LLC</u>

Michael E. Tucci
Christy M. Milliken
Stinson Leonard Street LLP
1775 Pennsylvania Avenue, NW, Suite 800
Washington, D.C. 20006
Tel: 202.728.3010
Tel: 202.728.3029
Fax: 202.572.9964
michael.tucci@stinson.com
christy.milliken@stinson.com
*Counsel for Appellant*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

In accordance with Federal Rule of Appellate Procedure 26.1 and Fourth Circuit Local Rule R. 26.1(a)(2), MBI makes the following disclosures:

1.    MBI Global, LLC is a Louisiana limited liability company that is wholly owned by parent company TCG Holdings, LLC.  No publically held corporation owns 10% or more of Appellant's stock.

2.    No publically held corporation or similarly situated legal entity whose shares are publically traded has a direct financial interest in the outcome of this litigation.

3.    Appellant is not a trade association.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ...........................................i

TABLE OF CONTENTS.................................................................. ii

TABLE OF AUTHORITIES ........................................................v

INTRODUCTION ........................................................................1

JURISDICTIONAL STATEMENT ...............................................2

STATEMENT OF THE ISSUES...................................................3

STATEMENT OF THE CASE.......................................................4

A.     Parties and Contract Background .....................................4

B.     Project Delays and Delivery Date Extensions ..................5

C.     Communications After August 3, 2014 and Litigation ..................8

D.     Al Soor Engineering Company and the Substitute Building.........10

E.     District Court's Exclusion of Communications and Summary
       Judgment.....................................................................11

F.     MEBN's Amended Damages Claim................................12

G.     Trial on Damages.........................................................15

SUMMARY OF ARGUMENT ...................................................16

ARGUMENT .............................................................................18

STANDARDS OF REVIEW .......................................................18

A.     Exclusion of Evidence .................................................18

B.     Findings of Fact and Law .............................................19

I.      THE DISTRICT COURT ABUSED ITS DISCRETION BY EXCLUDING
        COMMUNICATIONS OFFERED FOR THE PERMISSIBLE PURPOSE
        OF ESTABLISHING WAIVER AND ESTOPPEL DEFENSES.................19

II.     THE DISTRICT COURT ERRED BY FAILING TO APPLY THE
        UNIFORM COMMERCIAL CODE FORMULA FOR DAMAGES...........24

        A.      The District Court Failed to Apply the "Predominant Factor"
                Test, to Determine that the Purchase Order for the BRB Was a
                Contract for a Good, Rather Than a Service. .....................................24

                1.      The Language of the Contract is Consistent with Contracts
                        for the Sale of Goods…………………………………………27

                2.      The Nature of MBI's Business Was to Supply BRBs; it
                        Subcontracted Delivery and Installation Services……………28

                3.      The Intrinsic Worth of the BRB Materials Far Outweighed
                        the Costs of the Delivery and Installation Services..................30

        B.      Direct Damages Under the Uniform Commercial Code are the
                Difference in Contract Price and the Market Cost of "Cover"
                the Buyer Elects to Purchase. ................................................................31

        C.      The District Court Erred in Awarding MEBN its Damages for
                Lease and Security Costs, Because the Evidence Does Not
                Reflect that MBI Had Reason to Know of MEBN's Damages or
                Agreed to Be Liable for Consequential Damages...............................33

III.    THE DISTRICT COURT ERRED IN AWARDING DAMAGES AFTER
        DECEMBER 15, 2014, WHEN MBI WAS NO LONGER THE
        PROXIMATE CAUSE OF MEBN'S ALLEGED DAMAGES. ...................39

        A.      The District Court Should Have Excluded MEBN's Evidence
                of Damages After April 2015, Because MEBN Failed to
                Produce Documents Relating to Delay in the Construction of
                the Substitute Building. ........................................................................39

        B.      MBI's Breach was Not the Proximate Cause of MEBN's
                Damages After December 15, 2014. .....................................................42

IV.   THE DISTRICT COURT ERRED IN FINDING THAT MEBN
      REASONABLY MITIGATED ITS DAMAGES. .........................................47

CONCLUSION ......................................................................................50

REQUEST FOR ORAL ARGUMENT ....................................................50

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*139 Riverview, LLC v. Quaker Window Products*,
  90 Va. Cir. 74, No. CL-13-5877, 2015 WL 105211381 (2015)........................26

*Ausherman v. Bank of Am. Corp.*,
  212 F. Supp. 2d 435 (D. Md. 2002)....................................................20

*Bankcard American, Inc. v. Universal Bancard Systems, Inc.*,
  203 F.3d 477 (7th Cir. 2000) ..........................................................23

*Bonebrake v. Cox*,
  499 F.2d 951 (8th Cir.1974) ......................................................25, 28

*Carolina Indus. Prods. v. Learjet Inc.*,
  168 F. Supp. 2d 1225 (D. Kan. 2001)..............................................23

*Coakley & Williams Constr., Inc. v. Structural Concrete Equip., Inc.*,
  973 F.2d 349 (4th Cir. 1992) .......................................................21

*Coakley & Williams, Inc. v. Shatterproof Glass Corp.*,
  706 F.2d 456 (4th Cir. 1983) ...............................................26, 27, 30

*Crystal Coast Investments, LLC v. Lafayette SC, LLC*,
  No. COA15-118, 2015 WL 7729235 (N.C. Ct. App. Dec. 1, 2015)............21, 22

*CSX Transp., Inc. v. Casale*,
  247 Va. 180, 441 S.E.2d 212 (1994) ...............................................47

*Domain Name Clearing Co. v. F.C.F. Inc.*,
  16 Fed. App'x 108 (4th Cir. 2001)..................................................21

*Elite Entm't, Inc. v. Khela Bros. Entm't Inc.*,
  396 F. Supp. 2d 680 (E.D. Va. 2005) .............................................47

*Exxon Co. v. Sofec*,
  517 U.S. 830 (1996).....................................................................43

*In re Fairfax W. Apartment Owners Ass'n, Inc.*,
  932 F.2d 963 (4th Cir. 1991) .......................................................47

*Fiberglass Insulators, Inc. v. Dupuy*,
856 F.2d 652 (4th Cir. 1988) ............................................................20

*Filak v. George*,
267 Va. 612, 594 S.E.2d 610 (2004) ..................................................43

*Florists' Mut. Ins. Co. v. Tatterson*,
802 F. Supp. 1426 (E.D. Va. 1992) ...............................................43, 44

*General Elec. Co. v. Joiner*,
522 U.S. 136, 118 S. Ct. 512, 139 L.Ed.2d 508 (1997) .....................18

*Hannan v. Dusch*,
154 Va. 356, 153 S.E. 824 (1930) .....................................................47

*Hess Energy, Inc. v. Lightning Oil Co.*,
338 F.3d 357 (4th Cir. 2003) ............................................................32

*Johnson v. Hugo's Skateway*,
949 F.2d 1338 (4th Cir. 1991) ..........................................................21

*Kline Iron & Steel Co. v. Gray Commc'ns Consultants, Inc.*,
715 F. Supp. 135 (D.S.C. 1989) ........................................................29

*Koon v. United States*,
518 U.S. 81, 116 S. Ct. 2035, 135 L.Ed.2d 392 (1996) .....................18

*Manss-Owens Co. v. H.S. Owens & Son*,
129 Va. 183, 105 S.E. 543 (1921) .....................................................43

*Palmetto Linen Service v. U.N.X., Inc.*,
205 F.3d 126 (4th Cir. 2000) ............................................................25

*Plantation Shutter Co. v. Ezell*,
328 S.C. 475, 492 S.E.2d 404 (S.C. Ct. App. 1997) .........................26

*Plywood Panels v. The M/V Sun Valley*,
804 F. Supp. 804 (E.D. Va. 1992) .....................................................49

*Power Restoration Int'l, Inc. v. PepsiCo, Inc.*,
No. CIV. A. 12-1922, 2015 WL 1208128 (E.D. Pa. Mar. 17, 2015) .................29

*Princess Cruises, Inc. v. General Elec. Co.*,
   143 F.3d 828 (4th Cir.1998) ...................................................................25

*PRL USA Holdings, Inc. v. United States Polo Ass'n*,
   520 F.3d 109 (2d Cir. 2008) ..............................................................22, 23

*Reading Int'l, Inc. v. Malulani Group*, *Ltd.*,
   40 F. Supp. 3d 1312, 1327 (D. Haw. 2014).........................................23

*Reed v. Washington Area Metro. Transit Auth.*,
   No. 1:14CV65, 2014 WL 2967920 (E.D. Va. July 1, 2014) .............40

*Roanoke Hospital Ass'n* v. *Doyle & Russell Inc.*,
   215 Va. 796, 214 S.E.2d 155 (1975) ...............................................33, 34

*Robertson Cos., Inc. v. Kenner*,
   311 N.W.2d 194 (N.D.1981) .................................................................30

*Rockingham Cty. v. Luten Bridge Co.*,
   35 F.2d 301 (4th Cir. 1929) ..................................................................48

*Rogers v. Deane*,
   992 F. Supp. 2d 621 (E.D. Va. 2014) ..............................................34, 44

*Southern States Rack & Fixture, Inc. v. Sherwin-Williams Co.*,
   318 F.3d 592 (4th Cir. 2003) ...........................................................40, 41

*Starter Corp. v. Converse, Inc.*,
   170 F.3d 286 (2d Cir. 1999) .................................................................23

*United States v. Barber*,
   119 F.3d 276 (4th Cir. 1997) ...............................................................18

*United States v. Southern Contracting of Charleston, Inc.*,
   862 F. Supp. 107 (D.S.C.1994) ...........................................................26

*Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc.*,
   618 F.3d 417 (4th Cir. 2010) ...............................................................19

*Vienna Metro LLC v. Pulte Home Corp.*,
   786 F. Supp. 2d 1076 (E.D. Va. 2011) ................................................33

*Wahl v. McIver*,
    773 F.2d 1169 (11th Cir. 1985) ........................................................41

*Westberry v. Gislaved Gummi AB*,
    178 F.3d 257 (4th Cir. 1999) ..........................................................19

*Wilkins v. Montgomery*,
    751 F.3d 214 (4th Cir. 2014) ..........................................................41

*Xpander Pak v. Bostroem U.S.A.*,
    No. 3:96cv464, 1997 U.S. Dist. LEXIS 22536 (E.D. Va. July 31, 1997)..........43

*Zinner v. Olenych*,
    No. 2:14-CVL-63 MSD, 2015 U.S. Dist. LEXIS 73280
    (E.D. Va. June 4, 2015) .................................................................20

**Statutes**

28 U.S.C. § 1291 .....................................................................................3

28 U.S.C. § 1332 .....................................................................................2

Va. Code Ann. § 8.2-102 ........................................................................25

Va. Code Ann. § 8.2-105 ........................................................................25

Va. Code Ann. § 8.2-711 ...................................................................32, 33

Va. Code Ann. § 8.2-712 ........................................................................32

Va. Code Ann. § 8.2-715 ........................................................................34

**Rules**

Fed. R. Civ. P. 26 (e).........................................................................39, 40

Fed. R. Civ. P. 37 (c)...............................................................................40

Fed. R. Evid. 408 ........................................................................12, 20, 21, 23

**Other Authorities**

6 Bruner & O'Connor Construction Law § 19:21....................................47

## **INTRODUCTION**

This is a case about detrimental reliance. Defendant/Appellant MBI Global, LLC ("MBI"), a manufacturer of blast resistant buildings, contracted with Plaintiff/Appellee Middle East Broadcasting Networks, Inc. ("MEBN") to manufacture and deliver to Baghdad, Iraq a 20 x 20 reinforced steel box better known as a Blast Resistant Building ("BRB"). Delivery of the BRB was delayed, and the parties mutually agreed to a series of schedule extensions. Over the course of a year, MEBN sent letters purporting to cancel the contract, stating that MBI had breached the contract, and eventually brought suit for damages, however after each of these actions, it continued to insist MBI continue performance, and did not formally cancel the contract until the BRB was in transit to Baghdad. Once the BRB arrived, MEBN refused to accept it, and claimed damages for the entire year of delay, notwithstanding the agreed upon schedule extensions. As MBI argued before the District Court, MEBN's communications to continue performance waived any prior breach, and MBI reasonably relied on these communications in completing delivery of the BRB.

In reaching its verdict on liability for MEBN, the District Court abused its discretion by excluding communications offered to establish MBI's defenses of waiver and estoppel. The District Court broadly excluded all correspondence after August 3, 2014 as settlement communications, failing to consider the purpose for

which the communications were offered.  On the eve of trial, MEBN surprised

MBI by amending its complaint to seek damages for an additional year of rent for

studio space at the Crystal Ishtar Palace Hotel, tripling the amount of

compensatory damages claimed.  MBI learned that MEBN's follow-on contractor

had defaulted on its contract to timely construct a substitute building, and thus

MEBN had remained in the hotel, incurring rental charges.  MEBN never

furnished any documents during discovery relating to its follow-on contractor's

breach; rather, until this point, MBI had believed that the substitute building had

been timely completed.  MBI moved *in limine* to exclude the new damages from

trial.  Despite stating that it would rule "on the papers," the District Court

ultimately ignored MBI's motion.

Following a one day trial for damages, Judge Lee ruled on the record that

because the contract provided for the BRB to be delivered and installed, the

contract included services in addition to goods, and the Uniform Commercial Code

did not apply.  Deciding that MEBN's damages were direct as opposed to

consequential, the District Court thereafter awarded MEBN its full request for

damages.  For the reasons discussed below, the judgment should be reversed.

## JURISDICTIONAL STATEMENT

The District Court had diversity jurisdiction pursuant to 28 U.S.C. § 1332,

because the parties are of diverse citizenship and the amount in controversy

2

requirement was in excess of $75,000. MEBN has its principal place of business in Springfield, Virginia, and the parties agreed in their contract that any dispute would be litigated in the United States District Court for the Eastern District of Virginia. On December 1, 2015, the District Court entered a final judgment in favor of Plaintiff. Joint Appendix ("JA") at 808. On December 30, 2015, MBI filed a timely notice of appeal. JA at 809-810. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.      Whether the District Court abused its discretion in excluding certain communications as inadmissible settlement communications, where MBI sought to offer these communications for the permissible purpose of establishing its defenses of waiver and estoppel.

2.      Whether the District Court erred in finding that the contract was not governed by the Uniform Commercial Code.

3.      Whether the District Court erred in finding MBI liable for consequential damages.

4.      Whether the District Court erred in failing to consider MBI's motion *in limine* to exclude evidence of damages incurred in 2015.

5.      Whether the District Court erred in awarding damages for the time period of approximately December 15, 2014, through October 31, 2015, when MBI

3

offered evidence to show that it was no longer the proximate cause of MEBN's damages.

6.    Whether the District Court erred in finding that MEBN acted reasonably in mitigating its damages, when the BRB sat unused and in storage for a year while MEBN's follow-on contractor failed to timely complete a substitute building.

## STATEMENT OF THE CASE

### A.    Parties and Contract Background

Plaintiff/Appellee MEBN is a nonprofit corporation that provides news in Arabic via satellite, television, radio and the Internet to Arabic-speaking populations in the Middle East and North Africa.  JA at 362.  In 2013, MEBN solicited bids for a BRB to house its broadcasting news studio in Baghdad, Iraq.  JA at 368, 593-598.  The Contract called for the complete, manufactured building, as well as its delivery to MEBN's site in Baghdad.  JA at 366.  The request for quote was sent out to interested manufacturers of BRBs, so they could consider whether they wished to submit a bid.  JA at 368.

MBI is a Louisiana limited liability company.  The letters "MBI" stand for Modular Building Industries, JA at 458, and since 2008, MBI specialized in the production of modular blast resistant shelter products for sale to both governmental and commercial clients worldwide.  JA at 459.  MBI submitted a bid in response to

4

MEBN's request for quotes, and offered to supply the BRB, including delivery and installation, for the total price of $510,611.00.  JA at 575-592, 599.  In September 2013, MEBN and MBI executed a purchase order that incorporated MBI's proposal ("Contract") and provided for MBI to manufacture, deliver, and install the BRB in Baghdad, Iraq.  JA at 369-370, 599.  Upon executing the Contract, MEBN paid a down payment of $187,001 toward the purchase price of the BRB.  JA at 370, 600-606.

**B.    Project Delays and Delivery Date Extensions**

For a variety of reasons the project was delayed.  *See* JA at 465.  In January 2014, MEBN through its general counsel, Anne Noble, and MBI, through its President, Philip Moore, executed an amendment to the Contract ("January 2014 Amendment"), extending the BRB's delivery date.  JA at 371, 607-640.  Among other things, the January 2014 Amendment extended the delivery date for the BRB to April 16, 2014, removed the anti-indemnity provision, and in exchange, offered MEBN a credit of up to $100,000 toward the cost of the BRB.  JA at 372, 607-640.  MBI's CEO, Frederick Gossen, Jr. testified that MBI hoped to recoup much of the price of the credit, as MEBN had agreed to alter the BRB's design to a mild-grade steel building instead of the more expensive ballistic steel previously specified.  JA at 464.  Mr. Gossen also testified that MBI agreed to the credit for the purpose of keeping the customer happy, and that at no time was the credit to exceed $100,000.

5

JA at 466.  Finally, the January 2014 Amendment changed the governing law from Louisiana to Virginia.  JA at 376.  Anne Noble stated that one of the reasons for the change in applicable law was Virginia had adopted the Uniform Commercial Code in full, and at that time Louisiana had not:

> Q.    And the reason you gave Mr. Moore was that you wanted the UCC to apply under Virginia law, because it didn't apply under the Louisiana law; isn't that correct?
>
> A:     That was, I believe in an e-mail, one of the reasons I gave for that, yes.

JA at 422-423.

The January 2014 Amendment was the first of several agreements though which MEBN extended the time for MBI to deliver the BRB.  When the April 16, 2014 date arrived, the BRB was still incomplete, and MEBN sent a letter purporting to be a formal notice of breach.  JA at 153-154.  Immediately thereafter, however, it became clear that MEBN considered the contract still in effect, and intended for MBI to complete its production of the BRB and make delivery. Two days after the April 16, 2014 notice of breach, MEBN requested by email that MBI provide a certified verification that the BRB was built in conformance with the specifications.  JA at 156.  MBI responded with a certified letter and several photographs, showing the BRB's progress, and stating in an email that while it was engaging a third party engineer to confirm compliance with the specifications, it was continuing production of the building.  JA at 156-160.

6

Over the next month and a half, MBI provided weekly status reports, tracking the BRB's progress. JA at 164-262. At no time did MEBN cancel the Contract or indicate that MBI should cease production. *See* JA at 95-96. On May 20, 2014, the parties again contemplated delivery and installation, and even memorialized a plan to place the remaining Contract funds into escrow, payable upon delivery and installation of the BRB in Baghdad. JA at 269-273. Before delivery could occur, however, MBI's plans were stymied when its logistics subcontractor reported that due to violent attacks by terrorist groups and the fall of the city of Mosul, the planned route for the BRB was now closed. MBI's Counsel, Seth Robbins, notified MEBN of the news. JA at 74-75.

MEBN responded with two letters, both styled "Formal Notice of Cancellation." JA at 98-103. In the same email as it sent the June 20, 2014 cancellation letter, however, MEBN requested a final certification by an independent inspector to verify that the BRB was built in compliance with the specifications. JA at 104-106. MBI supplied the requested report on July 2, 2014, and also stated that a safe route for transport had developed. JA at 107-114. By letter dated July 3, 2014, MEBN again extended the delivery date thirty days. JA at 379, 641-642. Before the BRB could be transported, however, armies of the Islamic State of Iraq and the Levant ("ISIS") violently attached several check points that would have allowed access from Kurdistan into central and southern

7

Iraq, causing the Iraqi authorities to close those check points and prohibit commercial traffic. JA at 118. Cavalier Logistics, the shipping subcontractor tasked with delivery of the BRB, sent a letter advising MBI of the situation. JA at 118. MBI notified MEBN that it was invoking the force majeure clause of its contract on July 16, 2014. JA at 116-117.

## C.    Communications After August 3, 2014 and Litigation

The August 3, 2014 delivery date passed, and MEBN retained Peter Grenier as outside counsel. JA at 122. On September 4, 2014, Seth Robbins advised MEBN through its counsel that MBI had "formally taken steps to deliver the BRB to the install site in Baghdad." JA at 125-126. MEBN's counsel requested confirming documents, and the following day MBI replied with a purchase order showing charges for shipping the BRB. JA at 125-126. A week later, MEBN filed its lawsuit for breach of contract. *See* JA at 1.

This did not stop the parties' correspondence regarding delivery of the BRB however, and much as had previously occurred following its notices of breach and/or cancellation, MEBN continued to request updates and indicate that it was waiting for and would accept the BRB. JA at 128. Four days after MEBN filed its suit Mr. Grenier emailed Mr. Robbins, seeking "bona fide evidence that the BRB is in fact in transit." JA at 128. On September 19, 2014, Mr. Grenier renewed his request, stating that MEBN was insistent that it receive "documentation showing

8

the BRB is in transit." JA at 130. Mr. Robbins responded with an invoice from the transport company showing that MBI had paid the 75% shipping deposit, and reiterated that "MBI Global is continuing to fulfill its contractual obligations to fabricate, deliver, and install the BRB." JA at 130-132. On September 29, 2014, over two weeks after filing suit, Mr. Grenier emailed MBI, asking if Mr. Robbins was able to tell him the status of the BRB. JA at 134. He also stated that MEBN did not believe the BRB was on its way to Baghdad, but that "[b]y all means, if you have something to prove us wrong, send it over." JA at 134.

Relying on MEBN's continued requests for status updates and communications regarding the progress of the BRB, MBI shipped the BRB to Baghdad. *See* JA at 95-96. On October 29, 2014 – a full month and a half after MEBN filed suit – Mr. Grenier again inquired as to the status of the BRB, asking Mr. Robbins in an email where the BRB was. JA at 137. Mr. Robbins responded the same day, stating that the BRB was currently in transit, and attaching pictures taken the previous day, showing the BRB loaded onto a trailer, and stating that the parties "need to discuss the delivery of the BRB." JA at 137-140. Mr. Grenier replied that he had "no earthly idea where that photo was taken, or when, or that it is indeed the subject BRB." JA at 142. Grenier again requested information on where the BRB was located, and that while MEBN did not "need longitude and latitude . . . a city and country name would be nice." JA at 142.

9

On October 31, 2014, Mr. Robbins sent MEBN a request for consignee contact details from Origin Logistics, in order to arrange for the BRB's customs clearance. JA at 146. MEBN declined to provide the requested details, and Mr. Grenier stated only that MEBN had "proceeded to attempt to mitigate its damages." JA at 145. On November 7, 2014, Mr. Grenier indicated for the first time that MEBN was cancelling the contract and would not accept delivery of the BRB when it arrived in Baghdad. JA at 148. The BRB, which was in transit, ultimately arrived in Baghdad in November 2014. JA at 471. MBI filed a counterclaim for breach of contract against MEBN. *See* JA at 5.

## D.    Al Soor Engineering Company and the Substitute Building

As the litigation in the District Court continued, on February 6, 2015, the parties exchanged discovery requests. *See* JA at 302-312. Desiring to ascertain the steps MEBN had allegedly taken to "mitigate its damages," MBI requested all documents, correspondence, or communications relating to MEBN's decision to contract with another party to construct the BRB, and "all documents, correspondence, or communications relating to the construction of the building at the site." JA at 311. In response, MEBN produced a contract showing that it had contracted with a local entity called Al Soor Engineering Company ("Al Soor") in order to construct a "brick and mortar" replacement building for its television studio (the "Substitute Building"). JA at 402-405, 760-786. Per the contract, the

10

Substitute Building cost $125,591 and was to be completed by December 15, 2014. This apparently had not happened, however, and MEBN had executed an amendment with Al Soor in January 2015, extending the completion date until April 18, 2015 and raising the contract price to $173,541.  JA at 405-406, 787. MEBN provided copies of the contract and amendment in its discovery responses.

When MBI deposed William Clancy, the Chief Financial Officer and 30(b)(6) designee for MEBN, counsel inquired as to why the Substitute Building had not been completed on time.  JA at 338.  Mr. Clancy responded that the materials and specifications had changed, and admitted any delays were the combined fault of Al Soor and MEBN.  JA at 338.  Clancy also admitted that this was *not* the fault of MBI.  JA at 338.  The deposition was held on March 13, 2015, and at that time, MEBN indicated through its corporate designee that it expected the Substitute Building to be finished by the April 2015 completion date, as it was currently "on schedule."  JA at 338.

## E.    District Court's Exclusion of Communications and Summary Judgment

Following the close of discovery, MEBN moved for summary judgment on the issue of liability.  JA at 6, 71-72.  MEBN also filed a pretrial motion to exclude the email communications offered to show waiver and MBI's reliance on MEBN's statements, arguing that these were inadmissible settlement communications.  JA at 7; 36-37.  MBI opposed the motion, pointing out that the more recent

11

communications were no different than the back and forth correspondence that had

occurred between the parties since January 2014 relating to the BRB's delivery.

JA at 282.  MBI also asserted that it was not offering the communications for the

prohibited purpose of showing validity or amount of the dispute, but rather that the

communications were significant in and of themselves; they showed that MBI had

detrimentally relied upon MEBN's continuous representations to continue

production and delivery of the BRB, despite the fact that the delivery date had

passed, and legal proceedings had been initiated against it.  JA at 282-284.

The District Court did not look at the communications individually, or

provide reasons why Rule 408's permissible purpose exception did not apply.

After oral argument on July 10, 2015, the District Court ruled all communications

after August 3, 2015[1] were excluded, granted summary judgment on liability for

Plaintiff, and scheduled a damages trial for August 10-12, 2015.  JA at 286-287,

297-299.

## F.    MEBN's Amended Damages Claim

When MEBN filed its Complaint on September 11, 2014, it had sought

$250,000 in compensatory damages and the return of its down payment for the

BRB.  On July 31, 2015 – five business days before trial – MEBN sought leave to

---

[1] In its memorandum opinion on summary judgment the District Court decided that
August 3, 2014 was the date of breach.  JA at 294.

12

amend the *ad damnum* clause of its Complaint, to show that it now sought approximately $700,000 in damages. JA at 10, 34. The dramatic increase reflected an additional year of rental expenses from the Crystal Ishtar Palace Hotel ("Ishtar Hotel"), where MEBN had continued to lease studio space while Al Soor had failed to timely complete the Substitute Building in accordance with its contract. JA at 34. MEBN's amendment came as an unwelcome surprise to MBI, which until then, believed MEBN had moved into its completed space in April 2015, as MEBN's designees had stated in the deposition held March 13, 2015. JA at 338.

On August 4, 2015 – three business days before trial – MEBN sent counsel for MBI a link to a Dropbox folder containing documents not previously produced, including over 100 additional pages of 2015 invoices for the Ishtar Hotel, as well as payments made to Al Soor, and a contract with (and payments to) a consulting company hired in January 2015 to "supervise" Al Soor's work to construct the Substitute Building. MBI planned to move *in limine* to exclude this new evidence at the start of trial. The day before trial, however, Judge Lee postponed the trial on damages until November 30, 2015, and MBI consequentially filed its motion *in limine* to exclude the new evidence of damages on August 13, 2015. JA at 11, 300-301. MBI moved to exclude evidence of the additional damages on the basis that it was prejudiced by the nondisclosure of documents relating to the Al Soor's

13

default on its contract for the Substitute Building, and arguing that evidence of the increased damages should accordingly be excluded from trial.

Not only had MEBN failed to supplement its discovery showing that the Substitute Building was not complete in April 2015, but it had never produced anything during discovery to suggest the reason for the delays, despite a discovery request seeking "[a]ll documents, correspondence, or communications relating to the construction of the [Substitute] [B]uilding at the site." JA at 311. MEBN had supplemented its discovery responses since its initial document production; however at no time did it provide documents relating to the reasons for Al Soor's delay in completing the Substitute Building, or furnish any documents that indicated why the completion date of April 2015 was not achieved. Given the robust record of correspondence that MBI received from MEBN pertaining to the BRB's delay, it is counterintuitive that a similar set of communications did not exist between Al Soor and MEBN pertaining to Al Soor's breach, which should have been produced to MBI.

Without any documents relating to the Substitute Building's delays, MBI was significantly prejudiced in investigating and defending against a key part of MEBN's new damage claim – namely, that MBI's failure to deliver the BRB in August 2014 proximately caused MEBN's alleged damages in 2015. Had MEBN provided MBI any information to suggest that the Substitute Building would not be

14

ready until November 2015 MBI would have sought additional documents

pertaining to the reason for the delays, and made further inquiry into Al Soor's

breach.

MBI noticed its motion *in limine* for a hearing on August 21, 2015.  JA at

13.  The docket was later updated to indicate that Judge Lee would decide this

motion on the papers, JA at 13, however he never did so, nor did he do so at trial.

Counsel for MBI reminded Judge Lee of the pending motion in opening arguments

at trial, JA at 358, but the District Court never ruled on the motion *in limine*, and

MEBN was permitted to introduce evidence of its leasing of space at the Ishtar

Hotel continuing through October 31, 2015.

## G.    Trial on Damages

At trial, the District Court decided that because the Contract for the BRB

also contained service components such as delivery and installation, the Uniform

Commercial Code did not apply to dictate the formula for damages.  JA at 566.

The District Court also decided MEBN's lease expenses incurred at the Ishtar

Hotel were direct as opposed to consequential damages, and were within the

contemplation of the parties.  *See* JA at 568-69. The District Court found that

through Al Soor, MEBN had taken reasonable steps to mitigate its damages, and

awarded MEBN the full amount of damages it sought.   JA at 571-573.  A final

15

judgment was issued on December 1, 2015.  JA at 808.  This timely appeal

followed on December 30, 2015.  JA at 809-810.

## SUMMARY OF ARGUMENT

The District Court erred by refusing to allow evidence showing MBI's

estoppel and waiver defenses, as shown in the long record of communications

between the parties from January through October 2014.  Rather than consider the

permissible purpose for which MBI sought to offer these email communications,

the District Court gave no consideration to the stand alone significance of the

communications in proving MBI's estoppel and waiver defenses, or to the specific

contents of the messages themselves.  Instead, it issued a blanket ban on all

communications after August 3, 2014 as falling into the category of prohibited

settlement communications.  In light of this ruling, the court erroneously granted

summary judgment to MEBN.

Following a one day damages trial, the District Court reached the anomalous

conclusion that because the contract for the BRB also included service components

such as delivery and installation, the Uniform Commercial Code ("UCC") did not

apply.  In so ruling, the Court departed from the Fourth Circuit's test for

application of the UCC and the proper analysis as to whether goods or services

were the predominant factor in the Contract.  When the proper test is applied, the

16

evidence clearly establishes that the Contract for the BRB is for the sale of goods, and the UCC provides the applicable formula for damages.

Stemming from its failure to apply the UCC, the District Court further erred in deciding that MEBN's lease and security expenses were direct as opposed to consequential damages, and that such expenses were both within the contemplation of the parties, and allocated by agreement to MBI. The evidence in the record was inconsistent as to whether MBI had knowledge of the nature of MEBN's damages, and rather than account for the contradictory testimony or explain why it found MEBN's account more compelling, the District Court sided entirely with MEBN, and ignored testimony reflecting the opposite conclusion.

In any event, the District Court should have prohibited evidence of damages arising in 2015, as MBI was prejudiced by MEBN's failure to provide documents related to Al Soor's delay in timely completing the Substitute Building. Following its deposition of MEBN on March 13, 2015, MBI left with the impression that the Substitute Building would be complete by April 18, 2015. MEBN failed to furnish relevant documents to MBI in response to discovery requests that would have notified MBI that its follow-on contractor had defaulted on its delivery date, and established further support for its position that after December 15, 2014, MEBN's damages were no longer proximately caused by MBI's breach.

17

Finally, the District Court erred in finding that that MEBN took reasonable measures in employing Al Soor to mitigate its damages. The evidence before the District Court shows that for approximately an entire year – November 2014 through November 2015 – the BRB sat unused and in storage in Baghdad, while MEBN waited for Al Soor to complete the Substitute Building. At least twice, Al Soor defaulted on its contractual completion dates, and MEBN continued to incur rental expenses. As MEBN had paid only a small deposit to Al Soor and could have readily terminated the contract for convenience it was unreasonable not to do so, and MEBN did not satisfy its obligation to mitigate damages.

## ARGUMENT

## STANDARDS OF REVIEW

**A.     Exclusion of Evidence**

This Court reviews the decision of a district court to admit or exclude evidence for an abuse of discretion. *See General Elec. Co. v. Joiner*, 522 U.S. 136, 139, 118 S. Ct. 512, 139 L.Ed.2d 508 (1997). A district court abuses its discretion if its conclusion is guided by erroneous legal principles, *see Koon v. United States*, 518 U.S. 81, 100, 116 S. Ct. 2035, 135 L.Ed.2d 392 (1996), or rests upon a clearly erroneous factual finding, *see United States v. Barber*, 119 F.3d 276, 283 (4th Cir. 1997) (en banc), *cert. denied,* 522 U.S. 988, 118 S. Ct. 457, 139 L.Ed.2d 391 (1997). Even if a district court applies the correct legal principles to adequately supported facts, the discretion of the trial court is not boundless and subject to

18

automatic affirmance. *See Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999) (quoting *Wilson v. Volkswagen of Am., Inc.,* 561 F.2d 494, 506 (4th Cir.1977)) ("an appellate court would be remiss in [its] duties if [it] chose only to rubber stamp ... orders of lower courts") (internal quotation marks omitted).

## B.    Findings of Fact and Law

The Court of Appeals reviews a judgment resulting from a bench trial "under a mixed standard of review—factual findings may be reversed only if clearly erroneous, while conclusions of law ... are examined de novo." *Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc.*, 618 F.3d 417, 427 (4th Cir. 2010), *as amended* (Aug. 24, 2010) (quoting *Roanoke Cement Co., LLC v. Falk Corp.,* 413 F.3d 431, 433 (4th Cir. 2005)).   A court's calculation of damages "is a finding of fact and therefore is reviewable only for clear error, but to the extent those calculations were influenced by legal error, review is de novo." *Id.* (quoting *United States ex rel. Maddux Supply Co. v. St. Paul Fire & Marine Ins. Co.,* 86 F.3d 332, 334 (4th Cir. 1996)).

## I.    THE DISTRICT COURT ABUSED ITS DISCRETION BY EXCLUDING COMMUNICATIONS OFFERED FOR THE PERMISSIBLE PURPOSE OF ESTABLISHING WAIVER AND ESTOPPEL DEFENSES.

The District Court abused its discretion when it excluded certain evidence pertaining to MBI's defenses of estoppel and waiver.  "[E]vidence is not 'admissible' or 'inadmissible' as if occupying some never-changing solid, liquid,

19

or gas-like physical state governed by an inflexible disjunctive natural law, but instead is admissible or inadmissible, *depending on the purpose for which it is offered.* The case law, in this [Fourth] Circuit and elsewhere, confirms this fact with respect to Evid. Rule 408." *Ausherman v. Bank of Am. Corp.*, 212 F. Supp. 2d 435, 454-455 (D. Md. 2002) (emphasis in original). While Federal Rule of Evidence 408 generally prohibits evidence of offers to compromise or conduct and statements made during compromise negotiations "either to prove or disprove the validity or amount of a disputed claim . . . ." the court "need not prevent a litigant from offering such evidence when he does not seek to show the validity or invalidity of the compromised claim." *Fiberglass Insulators, Inc. v. Dupuy*, 856 F.2d 652, 655 (4th Cir. 1988) (quoting *Wyatt v. Security Inn Food & Beverage, Inc.*, 819 F.2d 69, 71 (4th Cir.1987)). Section (b) of the Rule expressly provides that the court "may admit this evidence for another purpose." Fed. R. Evid. 408(b).

In this case, MBI offered evidence of MEBN's communications not for the purpose of proving the validity or amount of its claim, but rather because the communications were significant *in and of themselves*, as a core element of its defenses of estoppel and waiver. Such communications are admissible when offered to establish a key element of a claim, and the District Court abused its discretion by excluding them. *See Zinner v. Olenych*, No. 2:14-CVL-63 MSD,

20

2015 U.S. Dist. LEXIS 73280, at *48 (E.D. Va. June 4, 2015) (voicemail offering sale of domain name admissible where offered "namely to prove an element at the core of Plaintiff's claim: whether Defendant possessed the bad faith intent to profit . . . ."); *Domain Name Clearing Co. v. F.C.F. Inc.*, 16 Fed. App'x 108, 11 n.3 (4th Cir. 2001) (defendant's demand for payment was properly admitted where offered to "speak[ ] directly to the bad faith determination."); *Coakley & Williams Constr., Inc. v. Structural Concrete Equip., Inc.*, 973 F.2d 349, 353-54 (4th Cir. 1992) (evidence not precluded by Rule 408 where offered to prove a party's intent with respect to the scope of a release); *Johnson v. Hugo's Skateway*, 949 F.2d 1338, 1346 (4th Cir. 1991) (consent decree properly admitted to show motive or intent).

Statements made in compromise negotiations are relevant and admissible when offered for the purpose of establishing a waiver or estoppel defense, just as MBI sought to do here. The North Carolina Court of Appeals recently analyzed the same issue in the context of a motion *in limine* to exclude certain settlement communications under the state's analog to Rule 408 when offered for the purpose of asserting the affirmative defense of waiver. *See Crystal Coast Investments, LLC v. Lafayette SC, LLC*, No. COA15-118, 2015 WL 7729235, at *11 (N.C. Ct. App. Dec. 1, 2015). The court of appeals found that evidence in settlement negotiations tending to show whether the plaintiff intended to waive its rights under the

21

contract, or whether defendant's owners believed such a waiver had occurred was both "relevant and admissible." *Id.* The court stated:

> In our view, the evidence Lafayette characterizes as settlement negotiations, such as emails between Sparkman and Lafayette's owners and related testimony, clearly demonstrates that Sparkman believed his company was still entitled to compensation under the Contract, which tends to show a lack of intent to waive. Moreover, this evidence also tends to show that Lafayette's owners agreed that Crystal Coast should be paid for its continuing work on the Project, which likewise reflects a belief that no waiver had occurred insofar as it tends to contradict Lafayette's argument that Crystal Coast was not entitled to any further compensation because the only additional work it performed after the Contract terminated as a result of the June 2010 invoice was to correct non-conforming work and deficiencies.

*Id.* The appellate court affirmed the trial court's denial of the motion *in limine*, as the evidence "was offered for a purpose other than to prove the validity or amount of Crystal Coast's claim." *Id.*

Similarly in *PRL USA Holdings, Inc.*, the Second Circuit addressed the same issue with respect to an estoppel defense. *See PRL USA Holdings, Inc. v. United States Polo Ass'n*, 520 F.3d 109, 114 (2d Cir. 2008). In *PRL*, the evidence at issue was "[w]ithout doubt . . . 'conduct [and] statements made in compromise negotiations,'" however offering the evidence was the only way the defendant could place its entitlement to estoppel in contention. *Id.* at 113-14. The plaintiff attempted to argue that by offering the evidence in support of an estoppel defense the defendant was still offering it to pronounce upon the validity/invalidity of a disputed claim, but the appeals court disagreed, noting that this reading would

22

render the exception in 408(b) meaningless, as well as negate the illustrative examples provided in the text of the Rule itself. *Id.* at 114. The court reasoned that the exception clearly intends to exempt from the Rule's prohibition "evidence focused on issues different from the elements of the primary claim in dispute." *Id.* Since the elements of the defendant's estoppel defense were separate and distinct from the elements of Plaintiff's trademark infringement claim, the evidence was allowed. *Id.*

Here too, the elements MBI must establish to prove estoppel and waiver are separate and distinct from those required for MEBN's breach of contract claim, and the District Court erred in summarily excluding them. *See also Bankcard American, Inc. v. Universal Bancard Systems, Inc.*, 203 F.3d 477, 484 (7th Cir. 2000) (admitting evidence regarding settlement negotiations to prove estoppel, and stating "it would be an abuse of Rule 408 to let [a party] lull [another party] into breaching the contract and then prevent [the other party] from explaining its actions because the lulling took place around the settlement table."); *Starter Corp. v. Converse, Inc.*, 170 F.3d 286, 292 (2d Cir. 1999) (admitted communications to show contractual and equitable estoppel); *Reading Int'l, Inc. v. Malulani Group, Ltd.*, 40 F. Supp. 3d 1312, 1327 (D. Haw. 2014) (communications made in mediation session were admissible "for another purpose" to prove estoppel); *Carolina Indus. Prods. v. Learjet Inc.*, 168 F. Supp. 2d 1225, 1230 (D. Kan. 2001)

23

(plaintiffs were not barred from using statements made during settlement negotiations to prove new claim of equitable estoppel arising from broken settlement promises). The use of settlement communications offered to prove waiver and estoppel is widely acknowledged, and the District Court abused its discretion in excluding all communications between MEBN and MBI after August 3, 2014.

## II.   THE DISTRICT COURT ERRED BY FAILING TO APPLY THE UNIFORM COMMERCIAL CODE FORMULA FOR DAMAGES.

The District Court erred as a matter of law in its conclusion that because the Contract involved installation and delivery services, the Uniform Commercial Code[2] did not apply.  As a result, the District Court failed to apply the correct damages formula for breach by a seller.

### A.   The District Court Failed to Apply the "Predominant Factor" Test, to Determine that the Purchase Order for the BRB Was a Contract for a Good, Rather Than a Service.

Despite lengthy testimony about the structure and dimensions of the blast resistant television studio at issue in this case, the District Court incorrectly determined that the Uniform Commercial Code ("UCC") did not apply to MBI's purchase order for a movable steel-reinforced box because delivery and installation

---

[2] MEBN's argument that the Contract was primarily for a service is ironic in light of the fact that MEBN expected, and *even specifically bargained for* the Uniform Commercial Code to apply.  *See* JA at 422-423.

services were also provided for by the Contract.  See JA at 566.  In so deciding, the District Court failed to apply the Fourth Circuit's test as to which aspect – goods or services – is the predominant factor in the contract, in order for the UCC to apply.

Virginia's Uniform Commercial Code applies to "transactions in goods," see Va. Code Ann. § 8.2-102, which are defined by the statute as: "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale  . . . ."  Va. Code Ann. § 8.2-105.  The BRB was a specially manufactured movable object, and falls squarely within the statute's definition.  *See* JA 459.  If a contract involves both goods and services, however, it qualifies as a UCC contract if its "predominant thrust" is the purchase of goods "with labor incidentally involved."  *Palmetto Linen Service v. U.N.X., Inc.*, 205 F.3d 126, 129 (4th Cir. 2000) (internal quotations omitted).  As this Court has explained:

> The test for inclusion or exclusion is not whether they are mixed but, granting that they are mixed, whether their predominant factor, their thrust, their purpose, reasonably stated, is the rendition of service, with goods incidentally involved (e.g., contract with artist for painting) or is a transaction of sale, with labor incidentally involved (e.g., installation of a water heater in a bathroom).

*Princess Cruises, Inc. v. General Elec. Co.*, 143 F.3d 828, 833 (4th Cir.1998) (quoting *Bonebrake v. Cox*, 499 F.2d 951, 960 (8th Cir.1974)).

Here, that the Contract incidentally involved the related services of installation and delivery does not change the fact that quintessentially, MEBN

25

contracted for the BRB itself. Even though a contract for a movable good might require delivery and/or installation services, this does not change the fact where the transaction is fundamentally for a good. *See United States v. Southern Contracting of Charleston, Inc.*, 862 F. Supp. 107, 109-10 (D.S.C.1994) (contract to manufacture and deliver incinerator was a sale of goods, despite seller having to design blueprints, submit plans for approval, and perform various other steps before manufacturing and delivering incinerator); *Plantation Shutter Co. v. Ezell*, 328 S.C. 475, 492 S.E.2d 404, 406–07 (S.C. Ct. App. 1997) (contract for purchase, installation, and adjustment of interior window shutters deemed a sale of goods); *139 Riverview, LLC v. Quaker Window Products*, 90 Va. Cir. 74, No. CL-13-5877, 2015 WL 105211381, at *2-3 (2015) (UCC applied to transaction involving sale and installation of windows).

Decisions using the "predominant factor" test emphasize three aspects, which may, or may not constitute indicia of the nature of the contract: (1) the language of the contract, (2) the nature of the business of the supplier, and (3) the intrinsic worth of the materials involved. *Coakley & Williams, Inc. v. Shatterproof Glass Corp.,* 706 F.2d 456, 463 (4th Cir. 1983). Here, all three aspects clearly establish that the Contract was predominantly for a good, rather than services.

26

1.    **The Language of the Contract is Consistent with Contracts for the Sale of Goods.**

The language of the Contract is largely consistent with a sales agreement for the purchase of goods as opposed to services.  In *Cober v. Corle*, a Pennsylvania court analyzed the similar question of whether a prefabricated steel building was a "good" under the Uniform Commercial Code.  *See* 416 Pa. Super. 191, 197-99, 610 A.2d 1036, 1039-40 (1992).   The appellant in that case argued, much as MEBN did at trial, that although the Agreement called for the sale of the steel building and the component parts, this was incidental to the "services" aspect of the agreement.  *Id.* At 1039.  Disagreeing, the court looked at the terms of the agreement itself, which clearly indicated that the predominant purpose of the transaction was a sale, where the agreement was titled "Purchase Agreement," and contained terms consistent with a buyer and seller completing a sale.  *Id.* at 1039-40.

Likewise in *RMS Tech., Inc. v. TDY Indus., Inc.*, this Court applied the indicia set forth in *Coakley & Williams, Inc.,* and considered the language of a contract in which the defendant agreed to fabricate, test, and deliver armor moving target carrier systems.  64 F. App'x 853, 856 (4th Cir. 2003).  Finding the contract was "rife with language peculiar to a transaction for a sale of goods," the Court affirmed the application of the UCC.  The contract in *RMS* was entitled "purchase order" and specifically addressed items such as risk of loss, passing of title,

27

warranties, and first article testing, all clauses generally used to ensure "that the contractor can furnish a product that conforms to all contract requirements for acceptance." *Id.* at 856. *See also Bonebrake*, 499 F.2d at 958 ("The language thus employed is that peculiar to goods, not services. It speaks of 'equipment,' and of lanes free from 'defects in workmanship and materials.' The rendition of services does not comport with such terminology.").

Here, too, the Contract is memorialized by a "Purchase Order" that on its face lists MEBN's individual contact person as a "Buyer" and contains the order quantity, net unit cost, and item/description. JA at 599. The Contract also addresses risk of loss, passage of title, and warranties, as is consistent with contracts for the sale of goods. JA at 586-587. Moreover, significantly more of the Contract language is devoted to the specifications for the BRB itself – not the means by which it is to be delivered or installed. *See* JA at 575-592. Accordingly, this factor heavily weighs in favor of finding the Contract is for the sale of goods.

### 2.    The Nature of MBI's Business Was to Supply BRBs; it Subcontracted Delivery and Installation Services.

The Court also considers the nature of the supplier's business in deciding whether goods or services are predominant in a contract. When it solicited bids for the BRB, MEBN sent its request for quotes out to interested *manufacturers of BRBs*, not to logistics companies that incidentally produced BRBs. JA at 368. As described in the testimony of its owner and CEO, MBI was a company in the

28

business of manufacturing steel buildings.  JA at 458-459.  It was not primarily in the delivery or installation business.  The Contract even indicated that the delivery and installation aspects would be subcontracted out to others, stating, "MBI Global will coordinate with [a] non-secure shipping company" and "[o]thers shall be responsible for providing cranes in Iraq to unload and interconnect the building." JA at 578, 582.  MEBN was aware that MBI relied on a subcontractor to ship the BRB, as its logistics company later provided a letter explaining that ISIS attacks had closed the shipping route.  JA at 118.  As the nature of MBI's business was wholly related to production of the BRB itself, this factor strongly supports the conclusion that the Contract was for the sale of goods.[3]

---

[3] Nor does the fact that MBI engages in proprietary design and engineering services in order to supply BRB change the fact that the contract was for a good, rather than a service.  *See Kline Iron & Steel Co. v. Gray Commc'ns Consultants, Inc.*, 715 F. Supp. 135, 139 (D.S.C. 1989) ("First, engineering, design, fabrication and inspection should not be characterized as separate services. The price of virtually every product sold includes charges for such 'services.'"); *Power Restoration Int'l, Inc. v. PepsiCo, Inc.,* No. CIV. A. 12-1922, 2015 WL 1208128, at *17 (E.D. Pa. Mar. 17, 2015) ("The proprietary nature of the EPQS is similar to that of a secret recipe: the seller may assemble the ingredients and prepare the food in a proprietary way, but any premium paid for the benefit of that secret recipe will not transform a contract for the sale of the finished product into a contract for the provision of proprietary services. Similarly, the premium paid for proprietary technology in this case is more properly attributed to the goods component of the contract than the service component, and goods predominate in the contract.").

### 3. The Intrinsic Worth of the BRB Materials Far Outweighed the Costs of the Delivery and Installation Services.

"While a service provider may supply some incidental materials for a project, a party that provides more than that is offering a unique finished good, not a service. *RMS Tech*, 64 Fed. App'x at 856. *See also Robertson Cos., Inc. v. Kenner*, 311 N.W.2d 194 (N.D.1981) (transaction providing for both sale and erection of pre-designed steel grain storage buildings is sale of goods within UCC). The Contract's proportion of the total price allocable to materials versus services reflects that the BRB was a good. The cost of installation services is broken out in the Contract as $37,000, comprising less than 10% of the price of the total. JA at 599. While not broken out as a line item in the Contract, the price of the delivery services was separately provided to MEBN around the time MBI shipped the BRB, and was $30,000. JA at 130-132. When compared to the total Contract price, the intrinsic worth of the services pales in comparison to the cost of the materials for manufacturing the BRB itself; the total cost of delivery and installation is approximately $67,000, or about thirteen percent, of the contract price of $534,311. Accordingly, the intrinsic worth factor also strongly suggests that the Contract was predominantly for the sale of a good.

Applying the Fourth Circuit's test and factors set forth in *Coakley & Williams, Inc.*, the evidence shows that the Contract's predominant purpose was the sale of a good, and not the provision of services. The District Court declined to

30

consider any of these factors, or even engage in the analysis as to whether goods or services predominated.  Instead, it based its conclusion that the UCC does not apply solely on the fact that services were also involved, and not that services predominated the contract.  *See* JA at 566.  As a result, the District Court erred in its legal conclusion that the UCC does not apply, and the judgment should be reversed.

> **B.    Direct Damages Under the Uniform Commercial Code are the Difference in Contract Price and the Market Cost of "Cover" the Buyer Elects to Purchase.**

The District Court erred in finding MEBN's damages were direct rather than consequential, and thus were recoverable.  Because goods and not services were the predominant thrust of the Contract, the Uniform Commercial Code supplies the relevant formula for a buyer's damages for non-delivery.  The Code permits a buyer to either "cover" by purchasing substitute goods, or recover damages for non-delivery:

> (1) Where the seller fails to make delivery or repudiates or the buyer rightfully rejects or justifiably revokes acceptance then with respect to any goods involved, and with respect to the whole if the breach goes to the whole contract (§ 8.2-612), the buyer may cancel and whether or not he has done so may in addition to recovering so much of the price as has been paid
>
> (a) "cover" and have damages under the next section [§ 8.2-712] as to all the goods affected whether or not they have been identified to the contract; or

31

(b) recover damages for nondelivery as provided in this title (§ 8.2-713).

Va. Code Ann. § 8.2-711. "Cover" is defined in the following section as "making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution of those due from the seller." *Id.* At § 8.2-712(1).

Where a buyer opts to cover, "the buyer may recover from the seller as damages the difference between the cost of cover and the contract price together with any incidental or consequential damages as hereinafter defined (§ 8.2-715), but less expenses saved in consequence of the seller's breach." *Id.* at § 8.2-712(2). Thus a buyer's direct damages under the UCC for non-delivery by the seller is the market-contract differential.[4] *See Hess Energy, Inc. v. Lightning Oil Co.*, 338 F.3d 357, 365 (4th Cir. 2003) (finding direct damages under the Uniform Commercial Code were the difference between the price buyer contractually agreed to pay for natural gas and the market price of the undelivered natural gas on the date of delivery).

Here, MEBN elected to purchase cover, the Substitute Building by Al Soor, at a price of $125,591. The price was subsequently increased to $173,541. Under the UCC, MEBN's direct damages are the difference between the cover it elected

---

[4] The Buyer may also recover so much of the price as has been paid. *See* Va. Code Ann. § 8.2-711(1).

to purchase (the price of the Substitute Building), and the Contract price of the

BRB ($474,311).  Since MEBN's chosen method of cover (the Substitute

Building) was less than the cost of the Contract for the BRB, the formula dictates

that its direct damages are zero,[5] and it may only recover the $187,001 that MEBN

had already paid toward the price of the Contract.  *See* § 8.2-711(1).

### C.   The District Court Erred in Awarding MEBN its Damages for Lease and Security Costs, Because the Evidence Does Not Reflect that MBI Had Reason to Know of MEBN's Damages or Agreed to Be Liable for Consequential Damages.

As a result of its erroneous finding that the UCC did not apply, the District

Court erred in determining that MEBN's damages for rental expenses and security

costs were direct damages and not consequential.  Unlike direct damages,

consequential damages arise from the intervention of special circumstances not

ordinarily predictable.  *See Roanoke Hospital Ass'n* v. *Doyle & Russell Inc.*, 215

Va. 796, 801, 214 S.E.2d 155, 160 (1975); *Vienna Metro LLC v. Pulte Home

Corp.*, 786 F. Supp. 2d 1076, 1085 (E.D. Va. 2011) (in breach of construction

contract to build infrastructure, the only direct damages were the present costs of

building the infrastructure).  The UCC provides in pertinent part that consequential

---

5 The UCC formula also allowed MEBN to capture the value of the $100,000
credit given to it by MBI in January 2014, as the Contract price, from which
MEBN subtracted its cost to purchase cover was $100,000 lower, and thus allowed
the option of purchasing more expensive cover.  That MEBN opted not to do so
was its own decision.

damages resulting from the seller's breach include "any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise." Va. Code Ann. § 8.2-715(2)(a).

In Virginia, a party may recover consequential damages only where the special circumstances were within the contemplation of all parties at the time the contract was made. *Rogers v. Deane*, 992 F. Supp. 2d 621, 629 (E.D. Va. 2014) (citing *Long v. Abbruzzetti*, 254 Va. 122, 127, 487 S.E.2d 217 (Va. 1997)).

As a general rule, contemplation must exist at the time the contract was executed, however when the breach alleged is an unexcused delay in completion, if the completion date has been altered by consensual amendment, contemplation is to be determined as of *the date of amendment*. *Roanoke Hospital*, 215 Va. at 802 (emphasis added).

On July 3, 2014 – the date the parties extended the delivery date to August 3, 2014 – the parties did not discuss, nor did their agreement contemplate, that MBI would assume liability for MEBN's moving expenses or extended rental of the Ishtar Hotel. *See Rogers*, 992 F. Supp. 2d at 629 (finding consequential damages were not recoverable where there was no proof that the parties agreed at the time of contracting that defendants providing accounting services contemplated being held responsible for plaintiff's unpaid income taxes and damage to plaintiff's business).

34

Despite earlier findings that the Contract's delivery date was extended by letter dated July 3, 2014, the District Court incorrectly looked to January 2014 as the relevant date to determine whether MBI had agreed to be responsible for paying the expenses of the rental. *See* JA at 565. The evidentiary record reflects that from January through July 2014, the parties regularly communicated about delivery of the BRB, however at no time – and not on July 3, 2014 – did the record suggest that MBI had accepted liability for MEBN's rental expenses incurred in 2014. Rather than allow the communications from May-July 2014 to illustrate the understanding of the parties with respect to MBI's liability for consequential damages, the District Court refused to consider the content of these communications for this purpose, and decided any testimony related to MBI's understanding of the price paid on delivery of the BRB constituted settlement communications. *See* JA at 432-435.

Nor does the evidence clearly show that MBI knew or had reason to know of MEBN's damages. In its decision, the District Court referred generally to testimony of Philip Moore regarding the $100,000 credit as related to MEBN's rental expenses from January through April 2014, and concluded that MBI knew of the damages and had accepted responsibility for the same. JA at 563-566. It did not, however, address Mr. Moore's subsequent testimony that showed that MBI had no understanding that MEBN continued to incur damages after April 16, 2014:

35

Q.    During the time period between April 16, 2014 and let's say June 1 of 2014, did you or [MBI] Global have an understanding as to whether M[E]BN was incurring expenses in connection with its non-receipt of the BRB?

A.    I was not aware that they were incurring expenses, no.

Q.    Okay.  For alternative housing for their studio?

A.    No.

Q.    No, they weren't, or no, you just don't know?

A.    I was not aware that they were incurring expenses for their ongoing operations.

JA at 519-520.  The District Court also failed to credit the testimony of MBI's CEO Frederick Gossen, who stated that the $100,000 credit negotiated in January was a business decision based on the switch to mild-grade steel, as well as a goodwill measure that limited MBI's exposure to consequential damages to the $100,000 negotiated at that time:

Q.    Now, when it says, up to $100,000 or – not to exceed – excuse me – a hundred thousand dollars, what did that mean?

A.    That's the authority I gave Phil to agree to.

Q.    At any time after this amendment was executed, did you agree to any further reductions in the purchase price?

A.    Absolutely not.

36

JA at 466.  Mr. Gossen's testimony also confirmed Mr. Moore's deposition testimony that MBI lacked knowledge of any ongoing damages incurred by MEBN after April 2014, and did not accept liability for the same:

Q.    In April, 2015, did MBI Global agree to be responsible for any rental payments, security payments or any other form of consequential damages being incurred by M[E]BN?

* * *

A.    No.

Q.    In April of 2014, did you have any understanding of the costs, expenses, rental payments that M[E]BN today alleges it incurred?

A.    No.

Q.    In May of 2014, did MBI make any agreement to be responsible for rental payments, security payments, or any other consequential damage, any other damages at all, alleged to be incurred by M[E]BN?

A.    No.

Q.    In May of 2014, did you have any knowledge that M[E]BN was incurring costs with respect to studio rental, security costs or any other expenses?

A.    No.

37

Q.     In June of 2014, did you have any understanding that M[E]BN was incurring costs, other damages, alleged damages, rental payments, security costs, with respect to the nondelivery of the BRB?

A.     No.

Q.     Did M[E]BN agree in June 2014 to be responsible for any alleged costs associated with rental payments, security payments, or any obtaining of alternate studio space?

A.     No.

Q.     Okay.  If I ask the same question with respect to June through November 2014, would your answer be the same?

A.     Yes.

JA at 469-470.  The District Court erroneously focused on Mr. Moore's testimony surrounding the negotiation of the $100,000 credit and relating to the time period of January-April 2014, and neglected to consider other parts of the testimony that supplied the complete understanding of the parties with respect to damages for April-November 2014.  As a result, the District Court erred in awarding MEBN its damages for the extended rental of the Ishtar Hotel and security costs, and its decision should be reversed.

38

### III. THE DISTRICT COURT ERRED IN AWARDING DAMAGES AFTER DECEMBER 15, 2014, WHEN MBI WAS NO LONGER THE PROXIMATE CAUSE OF MEBN'S ALLEGED DAMAGES.

The District Court further erred in awarding damages after December 15, 2014 when evidence showed that MBI's breach did not proximately cause MEBN's damages. Additionally, had the District Court properly considered MBI's motion *in limine*, MEBN should not have been permitted to introduce evidence of its damages incurred after April 2015.

#### A. The District Court Should Have Excluded MEBN's Evidence of Damages After April 2015, Because MEBN Failed to Produce Documents Relating to Delay in the Construction of the Substitute Building.

The District Court erred in allowing MEBN to present at trial evidence of damages incurred after April 2015, as MEBN failed to produce relevant documents relating to delays in construction of the Substitute Building, prejudicing MBI's ability to prove its breach was not the proximate cause of MEBN's damages. Moreover, the District Court ignored MBI's motion *in limine* entirely, and never made a finding that MEBN's failure to supplement its discovery responses was substantially justified or harmless.

According to Rule 26(e), a party must supplement its disclosures "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery

39

process or in writing." Fed. R. Civ. P. 26(e). If a party fails to provide information as required by Rule 26(e) to supplement its responses to requests for production, the party is not allowed to use that information at trial unless the failure was substantially justified or is harmless. Fed. R. Civ. P. 37(c)(1). *See Reed v. Washington Area Metro. Transit Auth*., No. 1:14CV65, 2014 WL 2967920, at \*2-4 (E.D. Va. July 1, 2014) (barring testimony of witnesses whose identities were not timely disclosed where plaintiff was unable to conduct any inquiry into their knowledge of the case). "The Rule 37(c) advisory committee notes emphasize that the *'automatic sanction'* of exclusion 'provides a strong inducement for disclosure of material that the disclosing party would expect to use as evidence.'" *Southern States Rack & Fixture, Inc. v. Sherwin-Williams Co*., 318 F.3d 592, 595 n.2 (4th Cir. 2003). (quoting Fed. R. Civ. P. 37(c) advisory committee note, 1993 Amendment) (emphasis added)).

The Fourth Circuit applies a five factor test to determine whether a nondisclosure is substantially justified or harmless: (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence. *Id.* at 596-97. The burden of establishing

40

these factors lies with the nondisclosing party—in this case, MEBN. *See Wilkins v. Montgomery*, 751 F.3d 214, 222 (4th Cir. 2014) (*citing id.*).

MBI noticed its motion for a hearing on August 21, 2016, however the District Court indicated that it would address the motion on the papers.  It never did so, and despite a reminder from counsel for MBI that the motion remained pending at trial, JA at 358, the court ignored the motion, and made no findings with respect to any of the factors from *Southern States*.  Regardless of how the District Court would have applied the factors, it was error in and of itself for the District Court to ignore the motion entirely.  *See Wahl v. McIver*, 773 F.2d 1169, 1174 (11th Cir. 1985) (despite circumstances not being present to warranty entry of default judgment, stating that it was "error for the district court to ignore completely the motion for default judgment.").

Had the District Court properly considered the *Southern States* factors, it should have determined that MEBN's failure to advise MBI of the continuing damages prolonged by Al Soor's delay, or to produce documents relating to the reason for the delay was neither substantially justified nor harmless.  MBI was met with surprise when, five business days before trial, MEBN tripled the amount of damages sought in its Amended Complaint.  JA at 34.  Until that point, as far as MBI knew, the Substitute Building had been completed on or about April 18, 2015, as MEBN had stated at the deposition of its corporate designees.  JA at 338.

41

As discovery had long since expired, MBI had no means by which to cure the surprise, as it could no longer investigate what failures of Al Soor and/or MEBN were responsible for the Substitute Building's delay. While the evidence offered was in the same form as the other rental invoices and would not disrupt the trial, the invoices would be significant in that they would drastically alter the amount of damages sought. *See* JA at 34. MEBN never offered a reason for its failure to provide documents relating to delays in the construction of the Substitute Building.

Accordingly, the District Court erred in that it made no finding that the nondisclosure was substantially justified or harmless, and evidence of damages after April 2015 should not have been permitted at trial.

### B.    MBI's Breach was Not the Proximate Cause of MEBN's Damages After December 15, 2014.

The District Court erred in awarding MEBN's rental costs for the time period of December 2014 through October 2015, because the evidence shows that after December 15, 2014, MBI's breach was no longer the proximate cause of MEBN's damages. In its ruling from the bench, the District Court focused on the defendant's burden to show an injured party's failure to mitigate damages, and ignored that *plaintiff* bears the burden of showing that the defendant's breach proximately caused the damages. *See* JA at 571. In this case, such a finding would be incompatible with MEBN's own testimony in the record.

42

"The elements of a breach of contract action are (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." *Filak v. George*, 267 Va. 612, 594 S.E.2d 610, 614 (2004).  Damages for breach of a contract "must be consequent upon a breach of the contract. If they are so remote as not to be directly traceable to that breach, or are attributable to some other intervening cause, then they cannot be allowed."  *Manss-Owens Co. v. H.S. Owens & Son*, 129 Va. 183, 105 S.E. 543, 549 (1921) .  While most often employed in tort analysis, the "proximate causation" label also restricts liability in contract, and the requirement of foreseeability may even be more stringent in the context of contract liability than it is for torts.  *Exxon Co. v. Sofec*, 517 U.S. 830, 839-840 (1996); *Xpander Pak v. Bostroem U.S.A.*, No. 3:96cv464, 1997 U.S. Dist. LEXIS 22536, at *41 n.36 (E.D. Va. July 31, 1997) (citing *id.*).

Under Virginia law, a proximate cause is the "act or omission which, in natural and continuous sequence, unbroken by an efficient intervening cause, produces the event, and without which that event would not have occurred." *Florists' Mut. Ins. Co. v. Tatterson*, 802 F. Supp. 1426, 1433 (E.D. Va. 1992) (citing *Commercial Distribs., Inc. v. Blankenship*, 240 Va. 382, 397 S.E.2d 840, 847 (1990)).   The definition of proximate cause excludes the intervention of any other culpable and efficient agency.  *Id.* (citations omitted).  A critical question in

43

determining whether an event is the proximate cause of an injury is whether there exists a self-operating, intervening cause, disconnected from the primary cause that produced the injury. *Id.* at 1434. Thus, in order for MEBN to recover its alleged damages, the District Court must have found that MBI's breach proximately caused MEBN's damages through the end of October 2015. *See Rogers v. Deane*, 992 F. Supp. 2d at 632.

Here, MEBN selected Al Soor, a local contractor to construct a Substitute Building, which Al Soor contracted to complete by December 15, 2014. JA at 760. Had Al Soor completed the Substitute Building as required by its contract, MEBN would have moved into the new studio space in December 2014, and would not have continued to incur expenses to rent space in the Ishtar Hotel from January-October 2015. Thus Al Soor – and specifically its inability to timely complete the Substitute Building – was a self-operating, intervening cause independent from MBI's breach that proximately caused MEBN's damages after December 2014.

The District Court erred in failing to consider evidence that showed that following December 15, 2014, MBI's breach was no longer the proximate cause of MEBN's damages, but that such damages were solely attributable to Al Soor and/or MEBN itself. As MBI's owner testified, MBI had no knowledge or involvement with Al Soor. JA at 473-474. MEBN's counsel Anne Noble also

44

recognized in her testimony that MBI had no role in the delay to complete the

Substitute Building:

> Q.    What did MBI do to keep the [Substitute] [B]uilding from being
>
> completed in December 2014? Nothing, right?
>
> A.    Nothing, no, I –
>
> Q.    And –
>
> A.    – I was not involved with it.
>
> Q.    I'm sorry.  And MBI didn't do anything to keep the [Substitute]
>
> [B]uilding from being completed in April of 2015, either, did it?
>
> A.    No.
>
> Q.    This was either a problem that – of M[E]BN's or a problem of Al
>
> Soor's, right?
>
> A.    Presumably, but as I testified, I don't know what the problems were.

JA at 445-446.

Further, had the District Court properly considered MBI's motion *in limine*,

it would have noted that MEBN's corporate designee specifically testified that the

reason the Substitute Building was not completed on December 15, 2014 was due

to defective materials being rescoped, and was a  "combination" of Al Soor and

MEBN's fault:

45

> Q.    All right.  Was [the Substitute Building] completed on December 15th, 2014?
>
> A.    No.
>
> Q.    Why not?
>
> A.    There were defects in materials and they had to be rescoped.
>
> Q.    Was that Al Soor's fault or MBN's fault?
>
> A.    Combination.

JA at 338.  Any delays after the amended April 18, 2015 completion date were even further removed from MBI's involvement with MEBN, and MBI had no way of even knowing whether the Substitute Building was complete, let alone any ability to affect its progress.  In reaching its decision to award MEBN its rental expenses through October 31, 2015, the District Court's decision is not supported by the evidence, which clearly shows the delays past December 15, 2014 were attributable to Al Soor or MEBN, and were *not* proximately caused by MBI's breach.  Rather, the record reflects that the inability of Al Soor to complete the Substitute Building was the only reason that MEBN remained in the Ishtar Hotel until November 2015, and continued to incur rental expenses through October 31, 2015.  Accordingly, the District Court erred in awarding MEBN its damages for rental expenses incurred after December 15, 2014.

46

## IV. THE DISTRICT COURT ERRED IN FINDING THAT MEBN REASONABLY MITIGATED ITS DAMAGES.

Finally, the District Court erred in its determination that MBI acted in a commercially reasonable manner to mitigate its damages, when despite the BRB's delivery in November 2014, MEBN continued to incur damages for approximately one year while Al Soor failed to complete the Substitute Building.

In Virginia as elsewhere, a non-breaching party has a duty to mitigate damages, and where it does not make reasonable efforts to do so, it may not recover the additional damages incurred. *Elite Entm't, Inc. v. Khela Bros. Entm't Inc.*, 396 F. Supp. 2d 680, 693 (E.D. Va. 2005); *In re Fairfax W. Apartment Owners Ass'n, Inc.*, 932 F.2d 963 (4th Cir. 1991) (injured person satisfies the duty to mitigate "if he uses ordinary efforts and reasonable expenditure to minimize consequential damages.") (quoting *Rosenberg v. Stone,* 160 Va. 381, 386, 168 S.E. 436, 437 (1933)); *CSX Transp., Inc. v. Casale,* 247 Va. 180, 185–86, 441 S.E.2d 212, 216 (1994) (plaintiff must do what reasonable man would have done to limit damages); *Hannan v. Dusch,* 154 Va. 356, 378, 153 S.E. 824, 831 (1930) (plaintiff must exercise "reasonable exertions or care" to prevent damages).

The aim of the mitigation requirement "is to avoid economic waste or misallocation of economic resources and to keep remedies in accord with the parties' own expectations." 6 Bruner & O'Connor Construction Law § 19:21 (citing 3 Dobbs Law of Remedies § 12.6 (2) (2d ed.)). Thus, a non-breaching party

47

may not simply "pile up damages." *Rockingham Cty. v. Luten Bridge Co.*, 35 F.2d 301, 307 (4th Cir. 1929).

Acknowledging MEBN's duty to minimize damages, the District Court found that MEBN reasonably identified Al Soor as a contractor to build a new building, and there was "no showing that there was some alternative builder who could have built the building faster or cheaper or with more efficiency." JA at 571-572. The District Court also found that the fact that it took Al Soor longer than anticipated "is of no moment." JA at 571-572. In its conclusion, the District Court focused narrowly on Al Soor's qualifications and availability, and ignored the fact that when Al Soor took up its work to construct a Substitute Building, the BRB had been delivered to Baghdad.

In her testimony, Anne Noble admitted that when MEBN approached Al Soor to come up with an alternative design for a standalone building, it did so as a "precautionary measure." JA at 400-401. The contract with Al Soor was executed on or about October 16, 2014, and MEBN paid a twenty-five percent deposit ($31,398) toward the contract price. JA at 442. The contract also permitted MEBN to terminate the contract for convenience on seven days written notice. JA at 442. The BRB was delivered to Baghdad in November 2014. JA at 471. Had MEBN terminated the contract, Al Soor would only have been entitled to costs for construction performed up to the termination date and wind-up costs, which could

48

not have been substantial at that early date. JA at 765. Moreover, MEBN would have had its television studio immediately, and there would have been no need to continue to lease space in the Ishtar Hotel, at the cost of over $20,000 per month. Where a plaintiff can purchase replacement goods at a lower cost through the exercise of reasonable care, it has a duty to do so. *Plywood Panels v. The M/V Sun Valley*, 804 F. Supp. 804, 813 (E.D. Va. 1992) (plaintiff not "entitled to a windfall" where could easily have ordered surplus plywood, rather than purchasing cover for a more expensive price on the spot market).

Even assuming that MEBN had acted reasonably in initially contracting with Al Soor, at several points it became unreasonable to continue with the contract, as it became clear that the Substitute Building would not be timely completed. In January 2015, the BRB remained in storage in Baghdad, while MEBN entered into an amendment to its contract with Al Soor, extending the completion date to April 2015, and also extending its rental expenses at the Ishtar Hotel another four months. JA at 406, 787. The BRB remained ready and waiting in Baghdad even as it did so. At some point, it became apparent that the Substitute Building would not be completed by April 18, 2015 either, and MEBN continued to incur rental costs for another six months while the Substitute Building was delayed. Nor did MEBN pursue legal action against Al Soor for its failure to timely complete the Substitute Building. JA at 444-445.

49

MEBN's attempt to minimize its damages produced an absurd result, where the BRB it ordered sat unused in storage, while MEBN continued to pile up rental damages for an entire year. It had numerous occasions to reasonably minimize its damages, and failed to do so. Such damages could have been readily avoided, had MEBN accepted the BRB, and ended its contract with Al Soor. The District Court erred in finding that MEBN acted reasonably to mitigate its damages, and it should not be permitted to recover its corresponding rental costs.

## CONCLUSION

For the reasons stated above, the District Court's judgment should be reversed, and this case should be remanded for resolution on its merits.

## REQUEST FOR ORAL ARGUMENT

Defendant-Appellant MBI Global, LLC respectfully requests oral argument in this matter.

Respectfully submitted this 31st day of May, 2016.

/s/ Michael E. Tucci
Michael E. Tucci
Christy M. Milliken
Stinson Leonard Street LLP
1775 Pennsylvania Avenue, NW, Suite 800
Washington, DC 20006
Tel: 202.728.3010; 202.728.3029
Fax: 202.572.9964
michael.tucci@stinson.com
christy.milliken@stinson.com
*Counsel for Appellant*

50

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

I, Michael E. Tucci, attorney of record for Defendant-Appellant in the captioned appeal hereby certify:

1.  The opening brief of Defendant-Appellant complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and specifically state that the brief contains 11,837 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) as indicated by the word processing system used to prepare the brief.

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word Professional Plus 2010, in 14 Point Times New Roman.

Dated: May 31, 2016

/s/ Michael E. Tucci
Michael E. Tucci
Christy M. Milliken
Stinson Leonard Street LLP
1775 Pennsylvania Avenue, NW, Suite 800
Washington, DC 20006
Tel: 202.728.3010; 202.728.3029
Fax: 202.572.9964
michael.tucci@stinson.com
christy.milliken@stinson.com
*Counsel for Appellant*

## CERTIFICATE OF SERVICE

I hereby certify that on May 31, 2016, I electronically filed the foregoing Brief of Appellant MBI Global, LLC with the Clerk of Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF User:

Peter C. Grenier, Esq.
Grenier Law Group PLLC
1400 L Street, N.W.
Suite 420
Washington, DC 20005
pgrenier@grenierlawgroup.com

/s/ Michael E. Tucci
Michael E. Tucci
Christy M. Milliken
Stinson Leonard Street LLP
1775 Pennsylvania Avenue, NW, Suite 800
Washington, DC 20006
Tel: 202.728.3010; 202.728.3029
Fax: 202.572.9964
michael.tucci@stinson.com
christy.milliken@stinson.com
*Counsel for Appellant*